# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-00507-SCT

*BILLY RAY HARRIS*

*v.*

*STATE OF MISSISSIPPI*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 2/23/2001 |
| TRIAL JUDGE: | HON. JOHN T. KITCHENS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAN W. DUGGAN, JR. |
| | CYNTHIA HEWES SPEETJENS |
| | MICHAEL V. WARD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | RICHARD D. MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/31/2003 |
| AMENDED MOTION FOR REHEARING FILED: | 03/31/2003 |
| MANDATE ISSUED: | |

### CONSOLIDATED WITH
### NO. 2001-KA-00656-SCT

*JASON HARRIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/23/2001 |
| TRIAL JUDGE: | HON. JOHN T. KITCHENS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |

ATTORNEYS FOR APPELLANT:      DAN W. DUGGAN, JR.
                                               CYNTHIA HEWES SPEETJENS
                                               MICHAEL V. WARD

| | |
|---|---|
| ATTORNEYS FOR APPELLANT: | DAN W. DUGGAN, JR. |
| | CYNTHIA HEWES SPEETJENS |
| | MICHAEL V. WARD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | RICHARD D. MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/31/2003 |
| AMENDED MOTION FOR REHEARING FILED: | 03/31/2003 |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH
## NO. 2001-KA-00665-SCT

*CHARLIE HARRIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/23/2001 |
| TRIAL JUDGE: | HON. JOHN T. KITCHENS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAN W. DUGGAN, JR. |
| | CYNTHIA HEWES SPEETJENS |
| | MICHAEL V. WARD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | RICHARD D. MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/31/2003 |
| AMENDED MOTION FOR REHEARING FILED: | 03/31/2003 |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The State's amended motion for rehearing is granted. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2.     Brothers Billy Ray (Bill), Jason, and Charlie Harris were indicted separately and tried together for the murder of Ronnie Travis. A jury seated in the Circuit Court of Madison County returned a guilty verdict against each for depraved-heart murder, as codified in Miss. Code Ann. § 97-3-19(1)(b) (2000). They were each sentenced to life imprisonment without parole. From these judgments, they instituted this consolidated appeal.

¶3.     Because the Court finds that the Circuit Court of Madison County committed no reversible error, we affirm the convictions and sentences.

## FACTS

¶4.     According to all the witnesses, the Windy City Club in Madison County was packed the night of November 7, 1999. That night at the club, Enell Weatherspoon catered a birthday party for her friend, Joan Booze. Booze's cousin and her cousin's boyfriend, Ronnie Travis, were in attendance. Also present at the club were the Harris brothers: Charlie, Jason, and Bill. While testimony differed as to who was the initial aggressor, a fistfight started inside the club between Ronnie Travis and Bill Harris. The fight spilled out the front door onto the street outside the club where Jason and Charlie Harris joined it. Several spectators watched the fight until gunshots were heard, and most took cover. At the conclusion of the fight, Ronnie Travis lay in the ditch across the street from the club. A passing motorist took Travis to the hospital. The Harrises fled the scene in a gold Cadillac. Travis died almost a day later due to cerebral trauma secondary to blunt force trauma; his head had been struck with sufficient force to cause the brain to swell to the extent that his body stopped performing basic functions.

¶5. An investigator from the Madison County Sheriff's Office arrived at the hospital after Travis had been taken there. He was told en route that Travis had been shot and acquired the names and telephone numbers of several people at the hospital who mistakenly believed Travis had been shot by Charlie Harris. Next, he went to the scene of the fight and took pictures. He observed a trail of blood drops leading from the Windy City Club across the street to the ditch where a large pool of blood had collected. He found a bloody white shirt in the street which belonged either to Travis or a bystander who had used it to wrap Travis's bleeding head before he was taken to the hospital. He also saw numerous spent bullet casings scattered about the parking lot, but none in the ditch.[1]

¶6. The investigator concluded from what he had been told at the hospital and the evidence at the scene that the Harris brothers were the perpetrators of what, at the time, was an aggravated assault. He verified that Charlie owned a gold Cadillac and worked at an automobile dealership in Jackson. He arrested Charlie Harris the following day at work.

¶7. On the way back to Madison County, Charlie Harris was informed of his *Miranda* rights and agreed to speak with the investigator about the events of the prior evening. During this conversation, Charlie denied shooting Ronnie Travis, but admitted that he had fought with him. The next day, Jason and Bill voluntarily surrendered to the Madison County Sheriff. They were also informed of their *Miranda* rights and agreed to speak with the investigator about the incident with Travis. Bill told the investigator, "I got to fighting with some boys in the club. One of them hit me with a gin bottle. The fight moved outside. I was on top of the boy in the ditch. Some other boys went to get their guns out of the trunk. I ran to the car and they were shooting at us." Bill did not see Travis with a gun. Jason told the investigator, "Me . .

---

[1]No tests were conducted on any blood on the ground or shirt, nor were tests conducted on Charlie Harris's gun or any bullet casings found at the scene.

. Bill and Charlie were sitting at the table. Ronnie came over to the table and asked Bill something. Ronnie hit Bill with a bottle. I went outside fighting. I was kicking him." When Ronnie Travis died of his injuries, the three brothers were indicted for depraved-heart murder.

¶8. At trial, the State called four witnesses: the state pathologist, the investigating officer, Weatherspoon, and Booze. The pathologist testified as to the cause of Ronnie Travis's death. Specifically, he stated that the bruises and injuries to Travis's body were inconsistent with being struck by solid objects such as a piece of wood, but favored a conclusion that Travis was struck by an elbow, fist or possibly a shod foot. He stated that it was unlikely Travis would be conscious after sustaining the injuries which killed him. The medical examiner stated conclusively that Travis had not been shot. During his cross-examination, the State objected on relevance grounds to a question concerning non-surgical scars found on Travis's body. The trial court sustained the objection, and the issue was not pursued further.

¶9. The investigator with the Madison County Sheriff's Office testified about the information he gathered in the course of his investigation, as summarized above. He also testified concerning the brothers' statements made after arrest.

¶10. Enell Weatherspoon testified that Ronnie Travis was sitting with her cousin at her table in the club when Bill Harris walked up and jabbed Travis in the face with his fingers. Bill then grabbed a full bottle of gin off her table and attempted to hit Travis with it. She stated Travis took the bottle from Bill but lost control of it, and it burst when it struck the ground. The fistfight erupted, and Travis had the upper hand when the fight and the crowd of observers moved outside. There, Bill Harris was assisted by his brothers. They grabbed Travis by his arms and took him across the street into the ditch where they repeatedly kicked him. When some observers tried to help Travis, Bill Harris pulled a gun from his boot and "started shooting into the crowd." Weatherspoon took cover beside her car, which was parked in front of the club, and saw

5

others flee inside the club. The brothers returned to kicking Travis, who was "balling up like this in the ditch, trying to keep them from kicking him in his face." When the passing motorist stopped and helped Travis, Bill Harris fired his gun down the highway at the car as it drove away. No one else was involved in the fight; all three brothers were larger physically than Travis; and Weatherspoon did not see the Harrises drive away nor anyone shoot at them in the gold Cadillac. Weatherspoon soon followed the motorist to the hospital and told the investigator about the event. She was not interviewed nor was her statement taken until December of the following year.

¶11. Joan Booze observed Bill Harris and Ronnie Travis fighting inside the club. Once the fight moved outdoors, she saw Ronnie Travis take off his shirt. She also saw the three Harris brothers kicking and beating Travis in the ditch across the street. She heard a gunshot come from the area of the ditch, but she backtracked from a statement she made to the investigator earlier that one of the Harris boys had a gun. She did not see them with a gun that night nor did she see one of them shoot back at the crowd.

¶12. The defendants called four witnesses to testify at trial: a radiologist, Arthur Black, Margie Brooks, and Charlie Harris. The sum of the radiologist's testimony was that Ronnie Travis could have sustained the injuries which killed him prior to the fight . He reached this conclusion was reached after examining the records of the autopsy performed on Travis's body, the hospital records, and one x-ray radiograph taken of Travis's head before he died. He compared Travis's case to one where a boxer dies days after a fight due to injuries sustained in the fight.

¶13. Arthur Black testified that he was related to both Ronnie Travis and the Harris brothers and had spoken to Travis right before the fight began. Before he testified about what he heard Travis say moments before the fight began, the State objected, and the jury was excused to resolve an issue of hearsay. Black had previously given a written statement to defense counsel alleging Ronnie Travis said, among other things,

6

"F—it, man, let's get it on" just before the fistfight began. The trial judge excluded any testimony Black might offer with regard to what Travis specifically said that night. When the jury returned, Black testified that when he spoke to Travis, he was standing between Travis and the table where the Harrises were seated. Travis had nothing in his hands at the time. Travis made a sudden motion in front of Black and then reached for something behind him. When Travis made a motion above his head, Black threw his hands up and their hands hit. Black heard a bottle break on the floor behind him. He concluded Travis had picked up a bottle from the table behind him. He then heard the Harris brothers rise from their table and a general commotion happening around him. He covered himself and saw nothing more inside or outside the club. He further testified that he heard both shotgun and pistol reports outside. Black testified that he did not see Travis with a gun that night and that Travis was smaller in stature than the Harrises. He was unaware of any prior encounter between Ronnie Travis and Bill Harris.

¶14.    Margie Brooks testified that, over a year before the fight at Windy City, Ronnie Travis had gone to her house, broken all the windows of her son's car and threatened to kill her entire family. Travis was armed with a pistol and shotgun and had used a baseball bat he found in the son's car to break the windows. He returned later, using profanity and again threatening to kill her family. During closing argument, the State asserted that Travis was angry because Brooks's son had stolen his car.

¶15.    Charlie Harris testified on his own behalf that he was not sitting at the table when Ronnie Travis approached it. He saw Travis kick Bill's chair and swing the gin bottle at Bill over Arthur Black, who had stepped between them. It broke when it hit Bill's raised hands, showering him with glass. He was unaware of any previous encounter between Bill and Travis; Charlie testified that when Bill grabbed Travis, four or five more people jumped into the fight against Bill. When they forced Bill to the floor and outside the club, Charlie testified he and Jason stepped in to help him. He then heard someone other than Ronnie Travis say,

7

"Go to the car and get your s—." Charlie ran to his car and got his gun. The fight now had ten to twelve participants and had moved into the ditch across the street. Charlie testified that while he was returning from his car with his pistol, he heard gunshots from the ditch and told his brothers to get in the car because someone was shooting at them. They got into the gold Cadillac and raced away. Charlie testified someone shot the back of his car with a shotgun as they were driving off. Several pictures of the gold Cadillac showing pellet-sized holes in the rear were admitted into evidence.

¶16. At the conclusion of trial, the court instructed the jury on the applicable law, including murder, manslaughter, and self-defense. It refused several more instructions. During its deliberations, the jury drafted two questions and presented them simultaneously to the judge. One question reads, "Can a person act in the heat of passion and at the same time events [sic] a depraved heart regardless of human life?" The other asks, "What is the definition of heat of passion?" The trial court answered the jury that it had given them all the instruction it could and ordered them to return to their deliberations. The jury found all three brothers guilty of depraved-heart murder.

## DISCUSSION

    **I.**    **WHETHER THE MURDER CONVICTIONS MUST BE REVERSED BECAUSE INSTRUCTION S-1 PRECLUDED THE JURY FROM CONSIDERING EITHER SELF-DEFENSE OR THE DEFENSE OF OTHERS.**

    **II.**    **WHETHER THE CONVICTIONS MUST BE REVERSED BECAUSE THE MURDER INSTRUCTION (S-1) ALSO FAILED TO TELL THE JURY THAT IF IT [sic] THEY HAD A REASONABLE DOUBT ABOUT WHETHER THE DEFENDANTS ACTED IN SELF-DEFENSE, IT HAD A DUTY TO ACQUIT.**

¶17. The Harrises argue that the State's depraved-heart murder instruction for each defendant – numbers 8, 9, and 10 – lacks two important phrases which warrant reversal: (1) "without authority of law" and (2)

8

"not in necessary self-defense." The Harrises also argue that the failure to instruct the jury that it had a duty to acquit them if the element "not in necessary self-defense" was not proven beyond a reasonable doubt also warrants reversal. These two issues are treated jointly because they are intertwined concerning the self-defense element. The State responds to the first issue by pointing out that instructions 8, 9, and 10 use the word "unlawfully," and other instructions place the burden of proof for conviction upon the State. With regard to the second issue, the State directs this Court to other jury instructions given which instruct the jury on self-defense and a statement made during closing arguments by the prosecution that the State must prove the murder was not committed in self-defense. The State also argues that even if the Harrises were entitled to further instruction on self-defense, the trial court's failure to do so was harmless error. In reply, the Harrises go to great lengths to distinguish a "concrete" instruction from an "abstract" instruction and argue that an "abstract" instruction cannot make up for the errors in a "concrete" instruction. Therefore, they argue that the instructions as a whole do not adequately instruct the jury.

¶18.    This Court employs the following standard of review when objections to given or refused jury instructions are raised:

> The standard of review for challenges to jury instructions is as follows: Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence. *Humphrey v. State,* 759 So.2d 368, 380 (Miss. 2000) (citing *Heidel v. State,* 587 So.2d 835, 842 (Miss. 1991)).

*Austin v. State,* 784 So.2d 186, 192 (Miss. 2001).  To preserve a jury instruction issue on appeal, the defendant must make a specific objection to the proposed instruction to allow the trial court to consider the issue. *Crawford v. State,* 787 So.2d 1236, 1244-45 (Miss. 2001).

9

¶19.    The full text of the single depraved-heart murder instruction given to the jury, duplicated for each defendant save for the substitution of the name of the correct defendant, is as follows:

> The Defendant, (name), has been charged in the indictment in this case with the crime of murder. If you find from the evidence in this case, beyond a reasonable doubt that the Defendant, (name), did on or about the 7th day of November, 1999, feloniously, willfully and unlawfully in Madison County, Mississippi,
>> 1.  Engage in an act eminently dangerous to others, or aid and assist in an act eminently dangerous to others; and that,
>> 2.  such act evinced a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual, and that
>> 3. such act inflicted injuries to **Ronnie Travis** which caused his death, then you shall find the Defendant, (name), guilty of Murder as charged in the indictment.
>
> If the State has failed to prove any one or more of the above listed elements, beyond a reasonable doubt, then you shall find the Defendant not guilty of Murder.

¶20.    The question whether this instruction errs because it fails to include the language "without authority of law" can be summarily resolved. As can be seen in its first paragraph, this instruction directs the jury that it must find beyond a reasonable doubt that the defendant acted "unlawfully." This Court has held the term "unlawfully" to be synonymous with, and an acceptable substitute for the phrase "without authority of law," specifically in the context of a depraved-heart murder instruction. *Turner v. State*, 796 So.2d 998, 1003-04 (Miss. 2001). The Harrises list the numbers underneath the first paragraph in support of their argument, but the term "unlawfully" is used immediately above this enumeration. We therefore hold that there is no merit to their argument that the trial court failed to instruct the jury on the element "without authority of law," even though its acceptable synonym does not appear in a separate enumerated paragraph.

¶21.    This Court must next consider whether the failure to instruct the jury to acquit if it found the Harrises were acting in self-defense and the failure of the depraved-heart murder instruction to include the words "not in necessary self-defense" constitute reversible error. In *Reddix v. State*, 731 So.2d 591 (Miss. 1999), the jury was given instruction S-2 which was a verbatim recitation of the self-defense instruction first

10

announced in *Robinson v. State*, 434 So.2d 206, 207 (Miss. 1983), *overruled on other grounds*, *Flowers v. State*, 473 So.2d 164, 165 (Miss. 1985). *Reddix*, 731 So.2d at 594. The trial court also refused to give an instruction tendered by the defense that would have made the jury aware of its duty to acquit if it determined the defendant was acting in self-defense. *Id.* On appeal, the defendant argued that S-2 did not completely instruct the jury on its duty to acquit if it found he acted in self-defense, and it was error to refuse his tendered self-defense instruction where no other instruction addressed the subject. *Id.* This Court agreed with both propositions and concluded the error warranted reversal. *Id.* at 595. Standing alone, the *Robinson* instruction does not sufficiently instruct the jury on self-defense because it fails to inform the jury that it is are bound to acquit if it finds the defendant to have acted in self-defense. *Id.* However, "we do not look at jury instructions in a vacuum." *Williams v. State*, 803 So. 2d 1159, 1161 (Miss. 2001). The Harris brothers' reliance on *Reddix v. State*, 731 So. 2d 591 (Miss. 1999), is misplaced. As in *Williams* and *Montana,* the problem found in *Reddix* is cured by the instructions in the case sub judice. *Montana v. State*, 822 So. 2d 954, 957 (Miss. 2002); *Williams v. State*, 803 So. 2d 1159, 1161 (Miss. 2001). The ultimate question here is whether the jury knew from the collective instructions given to them that the Harris brothers could be acquitted if they were acting in necessary self-defense. In reviewing a challenge to jury instructions, the instructions actually given must be read as a whole. *Montana*, 822 So. 2d at 957; *Williams v. State*, 803 So. 2d at 1161 (citing *Hickombottom v. State,* 409 So. 2d 1337, 1339 (Miss. 1992)). When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. *Id.*

*Reddix* is distinguished in *Montana* and *Williams*. *Montana*, 822 So. 2d at 961; *Williams,* 803 So. 2d at 1161. This Court held in *Williams* that if another instruction supplied the missing requirement,

11

the problem was cured. *Id.* The facts here, as in *Williams*, are distinguished from *Reddix* in that these instructions refer to self-defense as a defense. The instructions also discuss what has to be proven to find an "assault justifiable on the grounds of self-defense." As in *Montana*, the jury was given a manslaughter instruction which included the allegedly omitted words, "in necessary self-defense." *See Montana*, 822 So. 2d at 961.

¶22. Jury instructions are to be read together, and, if the jury is fully and fairly instructed by other instructions, the refusal of a similar instruction does not constitute reversible error. *Caston v. State*, 823 So. 2d 473, 507 (Miss. 2002). The Harrises' argument fails because the instructions, when read in their entirety, properly charged the jury on the issues of law the Harrises claim were omitted. Further, the instructions did not mislead the jury.

¶23. The State argues that use of the words "not in necessary self-defense" is not the only way of clearly telling the jury that the State had the burden of proving that the defendant was not defending himself. It points out that in this case, the jury was told that an assault is justifiable if the elements of self-defense were present. *See* Instruction 16A ("The Court instructs the jury that to make an assault justifiable on the grounds of self-defense, the danger . . . ."). The State cites *Evans v. State*, 797 So. 2d 811, 815-18 (Miss. 2000), where it claims this Court found it important that the instruction told the jury that a killing is "justified" under certain conditions. The State argues that the use of the word "justifiable" in Instruction 16A, combined with other instructions on the burden of proof, sufficiently instructed the jury on the law.

¶24. The State also points out that jury instruction 16A was requested by the defendants, not the State. It points to the designation in the lower right-hand corner of that instruction, which reads "D-8." It also points to the jury instruction charge conference, claiming that it further supports a finding that the instruction was requested by the defense. A defendant cannot complain of an instruction which he, not the State,

12

requested. ***Buford v. State***, 372 So. 2d 254, 256 (Miss. 1979); ***Musselwhite v. State***, 212 Miss. 526, 54 So. 2d 911 (1951).

¶25.    The State contends that the issue on appeal is not whether the Harrises were entitled to use reasonable force sufficient to repel the attack by Travis.  Rather, it submits that the question on appeal is whether they were entitled to use deadly force to repel the attack.  It argues that no evidence was presented which established that the Harrises had any reason to use deadly force.  Thus, the State concludes that no reasonable juror could have found that the Harris brothers needed to use deadly force against Travis in order to exercise reasonable self-defense.

¶26.    The statute under which the Harrises were convicted states in pertinent part:

> (1) The killing of a human being *without the authority of law* by any means or in any manner shall be murder in the following cases:
> (a) When done with deliberate design to effect the death of the person killed, or of any human being;
> (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;

Miss. Code Ann. § 97-3-19 (emphasis added).  As the italicized portion of the statute reveals, the phrase "without the authority of law" is an essential element of the statute.  Though the exact language from the statute was not used, this oversight is forgiven because the jury was adequately instructed through other language.

¶27.    There is no distinction between the that oversight and the failure of the instruction to include the language "not in necessary self-defense."  Many other instructions contained this language, so it cannot be said that the jury was not aware of its duty to acquit if it believed the Harrises were acting in self-defense. The jury instructions must be read as a whole, not singled out.  ***Heidel v. State***, 587 So.2d 835, 842

13

(Miss. 1991). If words and phrases with similar meaning are allowable for necessary phrases, such as "without authority of law", they are equally allowable for phrases such as "not in necessary self-defense."

¶28.    It was not error to give an instruction that omits the words "not in necessary self defense" when charging depraved heart murder when the Court also instructs the jury in a separate instruction that the killing would be justified if committed by the defendant in the lawful defense of his own person. The instructions, when read in their entirety, properly instructed the jury that a killing may not be murder, that the killing could be justified in self defense, the factors that must be considered when deciding if the killing was in self defense, and that the burden of proof is always on the State. Considering the instructions as a whole, this Court finds that the jury was properly instructed.

¶29.    The jury was instructed on self-defense; it just chose not to credit that defense. Indeed, the granting of any self-defense instruction was arguably erroneous, as the evidence did not support it. However, once granted, the instructions were sufficient to inform the jury that it was bound to acquit if it found that the Harrises acted in self-defense.

¶30.    The instructions also adequately informed the jury on the burden of proof. Instruction 3 tells the jury that the burden of proof is on the State, and "The Defendant is not required to prove anything." Instruction 5 tells the jury that the government is required to prove the defendant's guilt and the defendant has no burden. Instruction 6 expressly tells the jury that the defendant does not have the burden of proving that he acted in self-defense. Specifically, the first sentence, in part, tells the jury, ". . . it is never incumbent upon the accused to prove conclusively that the act was committed in self-defense." Instruction 16A told the jury what they must find in order ". . . to make the assault justifiable on the grounds of self-defense . . .". The purpose of jury instructions is to tell the jury what facts they have to find and who has the burden of proving or disproving those facts. Therefore, this Court determines the jury was adequately instructed

14

on the burden of proof.

¶31. We find that these assignments of error are without merit.

### III. WHETHER THE HARRISES' CONVICTIONS MUST BE REVERSED BECAUSE THE TRIAL COURT REFUSED THEIR REQUESTED INSTRUCTIONS ON THE DEFENSE OF ANOTHER.

¶32. The Harrises argue that the trial court erred in refusing to give two instructions which would have told the jury it could acquit if it found the defendants were acting in defense of others. The State counters that the evidence does not support a claim that deadly force was justified and that the jury was adequately instructed on self-defense by the trial court with Instruction 6. The Harrises reply that the facts do support an argument for self-defense and that only a "linguistically challenged juror [could] parse (Instruction 6) into a defense of another instruction…merely because of the inclusion of the word 'a'."

¶33. We find that the facts do not support the Harrises' argument and that Instruction 6 fairly and adequately covered this issue. Either taking the evidence as a whole or only the evidence in favor of the Harrises, there is no proof that Ronnie Travis was a danger to anyone other than the Harrises. The relevant portion of Instruction 6 reads: "All that is necessary to establish self-defense is that the defendants prove that there was a danger to the life of a defendant or good reason to believe that his life was in danger because of the actions of Ronnie Travis." The use of the word "a" in the sentence widens the scope of lawful self-defense from that of one of the Harrises protecting himself to that of all three Harrises protecting each other. If there was danger to any one of their lives, then the instruction allowed for their individual response to be justified by self-defense. By so instructing the jury, the trial court adequately covered the issue of self-defense with the jury, and it was not error to refuse other redundant instructions which are not supported by the facts.

### IV. WHETHER THE CONVICTIONS MUST BE REVERSED BECAUSE

15

## THE TRIAL COURT'S INSTRUCTIONS PRECLUDED THE JURY FROM CONSIDERING THE CRIME OF MANSLAUGHTER.

¶34. The Harrises primarily contend that Instructions 8, 9, 10 (depraved-heart murder instructions), 13, 13A, and 13B (manslaughter instructions) gave the jury no basis for distinguishing between depraved-heart murder and manslaughter because they did not define the degree of negligence associated with each. Furthermore, the Harrises assert that they were deprived of the defense of manslaughter since the jury was instructed that it must first find the defendants not guilty of murder before considering manslaughter. They also claim that their trial counsel rendered ineffective assistance of counsel by failing to object to that portion of the manslaughter instructions at trial. The State responds in two ways: by arguing the appellants waived any error here because they objected when the trial court instructed the jury on manslaughter, and by defining depraved-heart murder, malice aforethought, and heat of passion. It merely concludes that the two sets of instructions "are sufficient to instruct the jury on the difference in murder and manslaughter." In reply, the Harrises argue that objecting to the manslaughter instructions does not waive any complaint when it incorrectly states the law and notes that the offered definitions are not helpful when the State does not discuss how they apply.

¶35. The first question we must answer is whether a jury must always be instructed on the difference between depraved-heart murder and manslaughter when both are available for conviction. This Court requires the jury to be instructed on how to determine the "aforethought" portion of "malice aforethought" or "deliberation" portion of "deliberate design" where a defendant is on trial for deliberate design murder but the jury is also instructed on manslaughter. *See **Williams v. State***, 729 So. 2d 1181, 1183 (Miss. 1998). The Harrises argue that this Court should also require that a jury be instructed how to distinguish "heat of passion" from an act evincing a "depraved heart." They claim the necessity to instruct the jury

16

regarding the distinction in the later case is even greater than the necessity for the distinction in the former case.

¶36.    This Court has held that a trial court is not required to instruct the jury sua sponte or give instructions in addition to those tendered by the parties. *Gray v. State*, 728 So. 2d 36, 60 (Miss. 1998). Neither the prosecution nor, more importantly, Harrises offered an instruction to the trial court which would have instructed the jury on the difference between depraved-heart murder and heat of passion manslaughter. The trial court cannot now be found in error because the tendered and given instructions do not differentiate between the two. Concerning the claim that it is necessary in every case to differentiate between depraved-heart murder and heat of passion manslaughter, the instructions given here contain different elements which sufficiently differentiate "heat of passion" from acts evincing a "depraved heart" and no further instruction was necessary. Since the instructions are different on their face and contain different elements, we find that the trial court's instructions fairly and sufficiently instructed the jury as to the elements of each.

¶37.    The next question we consider is whether the jury instructions deprived the Harrises of their manslaughter defense by first requiring the jury to find the Harrises not guilty of murder. We have had one opportunity to rule upon this issue, but passed upon the chance once we found the defendant was procedurally barred from raising the issue on appeal because he did not object to the language at trial. *See Ballenger v. State*, 667 So. 2d 1242, 1256 (Miss. 1995). Such is the case here. The trial court instructed the jury on manslaughter over the Harrises' general objection. The record reflects that the Harris brothers did not want the jury instructed at all concerning manslaughter. There is no specific objection in the record concerning the language of the instruction requiring the jury to first find the Harrises not guilty of murder before considering manslaughter. The procedural bar applies.

17

¶38. Finally, the Harrises claim that their trial attorney rendered ineffective assistance of counsel by failing to object to this language. The Harrises argue that this alleged ineffective assistance of counsel requires reversal because "this case is extremely close on the issue of whether the killing was murder, manslaughter or self-defense." The State does not respond to the assertion that the Harrises received ineffective assistance of counsel at trial.

¶39. Where ineffective assistance of counsel is alleged, "the benchmark [ ] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In addition, the defendant must show that the counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S.Ct. 2052. In order to show prejudice under the *Strickland* standard, the Harrises must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. A defendant must make both showings under *Strickland*, otherwise, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Jones v. State*, 857 So.2d 740, 745 (Miss. 2003) (quoting *Stringer v. State*, 454 So.2d 468, 477 (Miss. 1984)). We find that the Harrises failed to satisfy either prong of *Strickland*. Thus, this issue is without merit.

**V. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN SUSTAINING THE PROSECUTION'S OBJECTION TO EVIDENCE OF RONNIE TRAVIS'S STATEMENT SHOWING THAT HE WAS THE AGGRESSOR.**

¶40. The Harrises argue that the trial court committed reversible error when it prohibited Arthur Black

18

from testifying that Ronnie Travis said, "F- it, man, lets get it on" and that Travis was cursing just before the fight with Bill Harris began. They allege the statement demonstrates Travis's state of mind and is relevant as evidence establishing Travis as the initial aggressor in the fight. The State replies that the statement does not prove Travis to be the initial aggressor, but does support a finding that Travis did voluntarily go outside to continue the fight with one or more of the Harrises. The State claims that the statement refutes the claim of self-defense and establishes a claim for mutual combat. After noting that the prosecution merely objected as to what was said, but not how Travis was behaving, the State concludes that exclusion of the statement did not prejudice the appellants and at most was harmless error. The Harrises attempt to counter this argument by reasserting that prior threats by a decedent are admissible.

¶41.    The admissibility of testimonial evidence is left to the sound discretion of the trial court within the boundaries of the Mississippi Rules of Evidence, and it will not be found in error unless it is has abused its discretion. Such error will warrant reversal only when the abuse of discretion has resulted in prejudice to the accused. *Parker v. State*, 606 So. 2d 1132, 1137-38 (Miss. 1992).

¶42.    At trial, the State objected to this expected testimony because it is hearsay. The trial court could find no exception to the hearsay rule which would accommodate this testimony so he excluded it. However, this testimony qualifies as an exception to the hearsay rule as a statement of a then-existing mental condition, or state of mind. M.R.E. 803(3). This Court has held that M.R.E. 803(3) encompasses relevant statements made by murder victims before their death. *Id.* at 1139. In the instant case, the statement Arthur Black overheard Ronnie Travis make to the Harrises just before the fight began is relevant to show that Travis intended to fight and might have been the initial aggressor. It was therefore error to exclude the testimony.

¶43.    However, we hold that this is nothing more than harmless error. Black's testimony concerning

19

Travis's actions and demeanor was sufficient to indicate to the jury that Travis might have been the initial aggressor. Specifically, he testified that Travis picked up the bottle and attempted to strike one of the Harrises with it, and he also testified about Travis's agitated state just before the fight. Charlie Harris's testimony that Travis walked up to the table, kicked Bill's chair, and attempted to strike him with the bottle bolsters this testimony. We find that no reversible error was committed here since the jury had sufficient evidence of Travis's conduct before the fight began. Thus, excluding the statement did not prejudice the Harrises. We find that this issue is without merit.

VI.   **WHETHER CHARLIE HARRIS'S CONVICTION MUST BE REVERSED BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT THE JURY THAT HE WAS NOT ON TRIAL FOR OTHER BAD ACTS.**

¶44.   The Harrises also allege it was error for the trial court to not give a cautionary instruction to the jury, specifically tendered instruction D-22, that Charlie Harris was not on trial for his previous D.U.I. conviction. They allege that the failure to so instruct the jury resulted in the jury's considered the evidence of the conviction for impermissible purposes. The State responds by pointing out that it was Charlie Harris who introduced the evidence of the prior D.U.I. conviction on direct examination, and none of the defendants asked for a limiting instruction at that time.

¶45.   The State is correct that Charlie Harris introduced his prior D.U.I. conviction through his testimony on direct examination. At that time, neither Charlie's counsel nor any other counsel for the defendants asked for a limiting instruction from the trial court. When the State cross-examined him, he admitted that he was drinking that night and drove the getaway car. This prompted the question from the prosecutor, "You're used to that, right, D.U.I.'s?" Defense counsel objected, but was overruled because, stated the judge, "It's in evidence he had a prior D.U.I." The trial court did not weigh the testimony's probative value

20

against the danger of unfair prejudice on the record after this objection. During closing argument, the prosecutor reminded the jury that Charlie was drinking and driving that night. No objection to this closing argument was made. The Harrises did object to the trial court's refusal to give instruction D-22, however, the record is unclear whether the trial court was specifically addressing D-22 at the time.

¶46. The trial judge has the burden to give a cautionary instruction to the jury when character evidence is introduced to show conformity with prior bad behavior. When the defendant objects to its admission, the trial court must balance its probative value against the danger of unfair prejudice. M.R.E. 105, 403, 609(a); *Smith v. State*, 656 So. 2d 95, 100 (Miss. 1995). We find that this rule envisions an objection contemporaneous with the admission of the testimony. As the prior bad acts evidence was introduced by the defendant himself, any objection Charlie Harris may have had concerning its entry into evidence has certainly been waived. The defendant did not object to the admissibility of this conviction until the State cross-examined Charlie Harris. He did not request a cautionary instruction until arguing which instructions should be read to the jury. As for the State's use of the information, there is nothing unduly prejudicial with the way the prosecutor cross-examined Charlie Harris with the D.U.I. conviction or with its use during the prosecution's closing argument. Furthermore, the Harrises did not object to the closing argument so any error there was not preserved for appeal. Thus, we find that this issue is without merit.

**VII. WHETHER THE HARRISES' CONVICTIONS MUST BE REVERSED BECAUSE THE TRIAL COURT DENIED THEIR REQUEST FOR AN INSTRUCTION WHICH WOULD HAVE TOLD THE JURY THAT A WITNESS COULD BE IMPEACHED BY EVIDENCE OF PRIOR INCONSISTENT STATEMENTS.**

¶47. The Harrises allege it was error for the trial court to refuse to give D-19 which would have instructed the jury that testimony by a witness may be discredited or impeached with prior inconsistent statements. Specifically, the Harrises argue that Weatherspoon's statement to the investigator that she took

21

cover from the shooting "down behind" her car is inconsistent with her trial testimony where she stated she hid "beside" her car. They also argue that Booze's initial statement to the investigator that Charlie Harris had a gun, which she retracted at trial, was inconsistent. They argue that these inconsistencies entitled them to jury instruction D-19. The State counters that neither prior statement is directly contradictory to the testimony adduced at trial to the extent that the statements have a reasonable tendency to discredit the testimony of Weatherspoon and Booze, thus warranting the instruction.

¶48. The standard for determining the propriety of refusing a tendered instruction was reiterated in *Ferrill v. State*, 643 So. 2d 501, 505 (Miss. 1994):

> The refusal of a timely requested and correctly phrased jury instruction on a genuine issue of material fact is proper, only if the trial court--and this Court on appeal--can say, taking the evidence in the light most favorable to the party requesting the instruction, and considering all reasonable favorable inferences which may be drawn from the evidence in favor of the requesting party, that no hypothetical, reasonable jury could find the facts in accordance with the theory of the requested instruction.

(quoting *McGee v. State*, 608 So. 2d 1129, 1134 (Miss. 1992) (emphasis in original), in turn quoting *Hill v. Dunaway*, 487 So. 2d 807, 809 (Miss. 1986) (no emphasis)). This is a standard contemplates giving instructions which correctly state the law and are supported by some evidence. *Id.* However, this Court has recently held that the trial court's general instruction that the jury determine the weight and credibility of a witness's testimony, coupled with cross-examination of the witness concerning the inconsistent statement and closing arguments drawing attention to the inconsistencies is sufficient to remove error from the refusal to give an impeachment instruction. *Swann v. State*, 806 So. 2d 1111, 1116-17 (Miss. 2002). This holding was not intended to completely deny defendants the availability of an impeachment instruction, but when the instruction is tendered based upon inconsistent statements concerning collateral matters, error is less likely to be found. Enell Weatherspoon's statement did not

contradict her earlier statement. Although the terms she used to describe how she took cover at trial differed from how she described it to the investigator, the point which the defense could not counter was that she could see the Harris brothers kicking Ronnie Travis after she saw Bill Harris shoot into the crowd. This is true regardless of how or where she hid. The defense was never able to prove, or get Weatherspoon to admit on cross-examination, that she could not see the Harrises kicking Travis, even though she was thoroughly cross-examined concerning this point and the defendants made much of alleged inconsistencies in her testimony during closing arguments. Furthermore, the trial court instructed the jury that it was to determine the appropriate weight and credibility of each witness in its deliberations. We must assume that the jury resolved any disbelief that it might have had regarding Weatherspoon's view of the crime, when considering her testimony, when it announced its verdict.

¶49.    In her testimony at trial, Joan Booze retracted a pretrial statement she made to the investigator. While she had previously told the investigator she saw Charlie Harris with a gun that night, she testified at trial that she only heard a gun that night and did not see who had it. However, Booze's statement that she could see the three Harrises kicking Ronnie Travis was not inconsistent with her earlier statement to the investigator. It was the defense's cross-examination which gave Booze the opportunity to withdraw the portion of what she said to the investigator. The defendants also called the jury's attention to the alleged inconsistencies in her testimony during closing arguments. In light of the trial court's given instruction concerning the weight and credibility of the witness's testimony, we find that it was not error for the trial court to refuse to give the impeachment instruction based upon Booze's retraction of a part of her statement to the investigator.

¶50.    The jury was instructed concerning what weight and credibility it could individually assign to any witness's testimony. Both Weatherspoon and Booze were cross-examined concerning their alleged

23

inconsistent statements. The defendants again called the jury's attention to the alleged inconsistencies during closing arguments. Both inconsistencies concerned matters collateral to the testimony which implicated the brothers in the act of murder. Therefore, we find that the trial court committed no error, and this issue is without merit.

## VIII. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ADMITTING THE ALLEGED CONFESSIONS OF THE DEFENDANTS.

¶51. The Harrises argue that it was reversible error to admit the confessions of the three brothers at trial because it violated their right to confront their accusers. The State counters that no error can be found in admitting Charlie's statement because he took the witness stand. The statements given by Bill and Jason do not implicate one another nor Charlie, so there was no violation of the right to confrontation. The State also argues that the defendants had plenty of time to move for a severance, but failed to do so, and trying the brothers together did not prejudice them.

¶52. As authority for finding reversible error based upon the right to confront the witnesses against them, the defendants cite *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998). A reading of these cases reveals the rule that where a codefendant's statement is introduced at a joint trial which powerfully implicates the defendant in a crime, a jury instruction or redactions which naturally suggest the defendant's name has been removed is not sufficient protection of the defendant's right to confront his accuser where the codefendant does not take the stand and subject himself to cross-examination by the defendant. *Gray*, 523 U.S. at 197, 118 S.Ct. at 1157; *Bruton*, 391 U.S. at 137, 88 S.Ct. at 1628. However, where the codefendant's statements do not facially implicate the defendant in the crime, there is no *Bruton* error. *Richardson v. Marsh*, 481 U.S. 200, 208-9, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987).

¶53.    Specifically, the defendants object to the testimony of the investigator concerning what the defendants told him:

> 1)    Bill told him, "They dropped me off at the projects at my girlfriend's house." (thus "implicating" Jason and Charlie)
>
> 2)    Jason told him,    "Me . . . Bill and Charlie were sitting at the table.  Ronnie came over to the table and asked Bill something.  Ronnie hit Bill with a bottle.  I went outside fighting.  I was kicking him." (thus "implicating" Bill and Charlie)
>
> 3)    During his testimony, the investigator said concerning Jason's statements, "I've got to leave out some of this, so it sounds choppy.  I'm not allowed to say all of it. . . .  It's hard for me to explain who he's talking about."  (thus "implicating" Bill and Charlie)

¶54.    We find that the first statement does not implicate Charlie and Jason in any criminal activity.  Read in context, the Harrises contend that this meant Charlie and Bill were in the car, ergo they were present at the club, the scene of the crime.  It is not against the law to drop someone off at his girlfriend's residence or be present at a club during a killing.   The defendants did not even attempt to make absence from the scene of the crime any part of their defense.  All three told the investigator they were there that night, and each eyewitness to the fight testified that they were there.  Furthermore, both Charlie and Jason admitted to fighting with Ronnie Travis.  Their collective defense was self-defense. Bill's statement did not  implicate the other brothers in anything beyond what they had already individually told the investigator.  Therefore, we find that the first statement does not constitute a **Bruton** violation, and it was not error for the investigator to testify concerning it.

¶55.    The second statement passes the **Bruton** challenge for the same reason.  All eyewitnesses testified that the Harris brothers were present at the club that night, and all three brothers admitted to the investigator that they were involved in the fight.  The defense offered at trial was self-defense, not absence. Therefore, the statement by Jason that the three brothers were present that night did not implicate any of

25

them in the subsequent murder. Again, it is not against the law to be present at the scene of a crime when it occurs. Thus, we conclude that this statement does not violate the defendants' right to confrontation.

¶56. The third statement, however, is more troubling. The investigator's testimony on the stand naturally drew attention to the fact that some information from the defendants' statements was being withheld from the jury. This was at the judge's instruction, but the defendants promptly moved for a mistrial when the investigator made the omissions known to the jury. The trial court overruled the motion, but it is fair to say that the jury knew that they were not told everything. Unlike *Gray*, however, this is not a case where a proper name was deleted which would obviously lead the jury to conclude that the defendant's name was the missing one. This is merely a statement made to the jury that portions of Jason's statement had to be removed. When the jury returned from the recess to discuss the mistrial, the trial court told the jury:

> Ladies and gentlemen, let me explain something to you. In civil trials and criminal trials, as I've told you earlier, my job is to make sure only admissible evidence comes before you. There's been some testimony here today by this particular witness concerning the different statements that he took from the defendants. We have had pretrial hearings on this case outside the presence of any jury, and I have ruled on certain portions of these statements that I won't let in. Okay? This happens in every case. It's nothing unusual about that.
>
> This defendant made a comment about it being–I think he said choppy or something. I can't recall. I want to ask you to just disregard that statement made by this particular witness. It has no basis in law, and it doesn't run afoul of my prior rulings on the evidence in this case.
>
> There are some things that I have redacted from these statements that simply are not admissible evidence, such as hearsay statements and things such as that. I don't want you to find it prejudicial against either of the defendants that this witness has made the statement. He simply made the statement in a way of trying to explain to you that it could sound choppy when he's relating you the testimony.
>
> Its my fault because I have ruled on certain pieces of evidence that are in these statements. So can each one of you tell me that you can accept this explanation from me and disregard the statement of this witness? Can each of you tell me that you'll do that and not hold it against these defendants? Okay. All right. You may proceed.

As can be seen from the investigator's statement, no criminal activity was alleged and no defendant was

26

implicated in any portion of the act which occurred that night. It is safe to assume the jury was probably full of natural curiosity. However, we hold that the trial judge's instruction was sufficient to satisfy the jury's curiosity without drawing attention to the fact that the investigator might have been leaving out Charlie and Bill's names from Jason's statement. It is true that the trial judge gave the defendants ample opportunity to sever the trials, the last offer coming as late as the Friday before the joint trial began on Monday. The trial courts and prosecution should be mindful that statements made by codefendants in joint trials face a higher level of scrutiny for violations of the right to confrontation. Where it appears that the evidence, even if revealed inadvertently to the jury, would naturally indicate to a jury that a statement by a codefendant implicates another defendant, it is best to sever the trials. *See generally **Harrington v. State***, 793 So. 2d 626 (Miss. 2001). Having acknowledged this danger, we find that no ***Bruton*** violation attended the investigator's statements that he could not reveal portions of Jason Harris's statement. This issue is without merit.

## IX. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN UNDULY RESTRICTING DEFENDANTS APPELLANTS IN PRESENTING THE DEFENSE THAT TRAVIS MIGHT HAVE SUSTAINED THE FATAL INJURIES AT SOME TIME PRIOR TO THEIR ALTERCATION WITH HIM.

¶57. The Harrises contend that the trial court committed reversible error when sustaining the State's objection to the question on cross-examination of the state pathologist about non-surgical scars found on Ronnie Travis's body. They also cite the refusal of tendered instruction D-14 was reversible error. The instruction would have told the jury that the State must prove the acts of the defendants were such that death was the natural and probable result. These contentions are meant to be read together as the Harrises theory concerning the non-surgical scars on Travis's body was that they indicated Travis was injured prior to the fight that night at the club, and his death was not caused by the defendants. The State counters that

27

the Harris brothers failed to show by testimony or offer of proof how the scars might have been caused by an earlier fight. It concludes that the other instructions given to the jury concerning proximate cause covered the requisite level of proof the State must offer for conviction.

¶58. A trial court will not be found in error concerning the admissibility of testimonial evidence unless it has abused its discretion. *Parker*, 606 So. 2d at 1137-38. The error is reversible only upon a showing that the error prejudiced the accused. *Id.* It appears that the defendants were on a fishing expedition with the pathologist, attempting to catch evidence which would indicate that the non-surgical scars on Ronnie Travis's body caused his demise. Without an offer of proof or a good-faith basis for asking about the scars, we cannot say that the trial court abused its discretion in sustaining the State's objection and refusing to give the requested instruction. The defendants did not call a witness to testify that Travis was in a fight earlier that day or week. The defendants did not offer their own medical testimony that the injuries which the non-surgical scars indicate occurred previously to Travis would cause this type of death. Finally, the defendants did not pursue the matter with the trial court. The question about the non-surgical scars was the last one asked by the defendants on cross-examination of the pathologist, and when the prosecution's objection was sustained, the defense tendered the witness back to the prosecution for rebuttal. Without deciding the merits of the arguments for the jury instruction, we conclude that this issue is also without merit.

## CONCLUSION

¶59. We find that the Circuit Court of Madison County committed no reversible error and that the Harrises' assignments of error are without merit. Therefore, the judgments of the Circuit Court of Madison County are affirmed.

¶60. **BILLY RAY HARRIS: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

28

¶61.    **JASON HARRIS: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

¶62.    **CHARLIE HARRIS: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**WALLER, COBB, EASLEY AND CARLSON, JJ., CONCUR.  PITTMAN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND GRAVES, J. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY PITTMAN, C.J.  DIAZ, J., NOT PARTICIPATING.**

**PITTMAN, CHIEF JUSTICE, DISSENTING:**

¶63.    The majority overlooks plain error in its opinion today.  Its attempts to distinguish ***Reddix v. State***, 731 So. 2d 591 (Miss. 1999), do not withstand scrutiny based on the facts and the law.  It is clear that in its deliberations the jury paid very close attention to the differences between the depraved heart murder instructions and the manslaughter instructions. Indeed, after deliberations had begun, it even asked the trial judge for further instruction as to the differences between the two.  The depraved heart murder instructions for each defendant–instructions 8, 9, and 10–did not instruct the jury on its duty to acquit if it found the defendants acted in self-defense, nor do they list "not in necessary self defense" as an element of depraved heart murder.  It is also clear that ***Reddix*** found reversible error where a jury was not adequately instructed on its duty to acquit if it found the defendant was acting in self-defense.  Since the majority fails to recognize that ***Reddix*** controls the outcome of this case and mandates reversal and remand for a new trial, I respectfully dissent.

¶64.    The majority gives several reasons why ***Reddix*** is distinct from the instant case.  First, it states that the instructions other than 8, 9, and 10 refer to self-defense as a defense.  Second, it states that another instruction (apparently 16a) discusses what must be proven to find an "assault justifiable on the grounds of

29

self defense." Third, the majority claims that the omission of the element "not in necessary self defense" has been sanctioned by this Court previously under similar circumstances. Fourth, it states that the defendants cannot complain that the *Robinson* instruction 16A was given because they requested it. Fifth, it states the depraved heart murder statute does not contain the language "not in necessary self defense," thus it was not required and this Court generally approves of instructions which track the language of the statute. Finally, it states that other words like "without authority of law" and "unlawfully" should be read to make up for the lack of "not in necessary self defense." These reasons are either unfounded or insufficient to distinguish this case from *Reddix*.

¶65.    The "many other instructions" which refer to self-defense in any way are 6, 12, 13, 13A, 13B, and 16A. Instructions 12, 13, 13A, and 13B are specifically tailored manslaughter instructions. Instruction 16A is the *Robinson* instruction which does not inform the jury of its duty to acquit if it found the defendants acted in self-defense. The majority's reliance upon this instruction to bridge the gaps in 8, 9, and 10 is misplaced for the same reasons found in *Reddix*. Instruction 6, reproduced in its entirety, reads as follows:

> The Court instructs the Jury that every killing of a human being is not murder, and that it is never incumbent upon the accused to prove conclusively that the act was committed in self-defense. All that is necessary to establish self defense is that the defendants prove that there was a danger to the life of a defendant or good reason to believe that his life was in danger because of the actions of Ronnie Travis.

The instruction obviously instructs the jury on the proof required of the defendants who claim self-defense. It, like the *Robinson* instruction, does not inform the jury of its duty to acquit should it find sufficient proof of self-defense. It is an inadequate supplement to Instructions 8, 9, and 10. Therefore, *no* instruction in the record informs the jury of its duty to acquit the defendants of murder if it found the defendants were

30

acting in self-defense.

¶66.    The majority's reliance on *Montana* and *Williams* is misplaced because their jury instructions on murder–the crime of which both were convicted–quite clearly stated that the jury must acquit if it found the defendants acted in self-defense. *Cf. Montana v. State*, 822 So. 2d 954, 959 (Miss. 2002) ("The Court instructs the jury that if you find from the evidence in this case beyond a reasonable doubt that: Joseph Scott Montana was not acting in self-defense, or defense of others, then you shall find him guilty of murder. If you find the State has *failed to prove* any more [sic] of the essential elements of the crime charged, *you must find the defendant not guilty of murder*.") (emphasis in original); *Williams v. State*, 803 So. 2d 1159, 1162 (Miss. 2001) ("However, in addition to the *Robinson* instruction, the jury below was given instruction S-1. This instruction provided the jury with the elements of murder, including that 'the shooting was not in necessary self-defense.'").

¶67.    The majority also misstates the defendants' claim of error when it argues that they cannot complain of the presence of the *Robinson* instruction because they submitted it. Their claim is that Instructions 8, 9, and 10 do not adequately instruct they jury with respect to self defense of murder, they submitted and were refused an acceptable alternative to instructions 8, 9, and 10 in the form of D-10 which contained the missing language "not in necessary self defense," and no other instruction–including the *Robinson* instruction 16A–adequately supplements instructions 8, 9, and 10. Who submitted the *Robinson* instruction is immaterial so long as instructions 8, 9, and 10 are defective. The *Robinson* instruction did not create error in *Reddix*. In *Reddix*, this Court clearly stated that the *Robinson* instruction alone was insufficient to cure the defective aggravated assault instructions which did not instruct the jury on its duty to acquit if Reddix was acting in self-defense. *Reddix*, 731 So. 2d at 595.

31

¶68.    I fail to see how a jury can be expected to understand without instruction that "unlawfully," "without authority of law," or "justified" mean the same thing as "not in necessary self defense."  I do not agree that "not in necessary self defense" is synonymous with any of them like "unlawfully" and "without authority of law" are synonyms.  The majority fails to cite any authority from this Court which justifies such a conclusion.[2]  The fact that the depraved heart murder statute does not contain the language "not in necessary self defense" means nothing to the analysis of the issue either.  A quick review of the aggravated assault statute under which Reddix was charged reveals that no such language exists in it as well.  *See* Miss. Code Ann. § 97-3-7(2)(b) (Rev. 2000); **Reddix**, 731 So. 2d at 592.  The holding in **Reddix** demonstrates that instruction on the duty to acquit in cases of self defense is necessary, even where the statute does not list self-defense as an element or contain self-defense language, and the failure to provide such instruction is reversible error.  There is no support for the majority to be found in the statute's failure to list self-defense as an element of the crime.

¶69.    The majority concludes with the argumentative notion that the jury probably should not have been instructed on self-defense at all.  This is contrary to what our case law states, including case law cited by the majority.  *Cf.* **Williams**, 803 So. 2d at 1161 ("In a homicide case, as in other criminal cases, the court should instruct the jury as to theories and grounds of defense, justification, or excuse supported by the evidence, and a failure to do so is error requiring reversal of a judgment of conviction. Even though based on meager evidence and highly unlikely, a defendant is entitled to have every legal defense he asserts to be

_____

[2]The closest thing to support offered is where the majority refers to the State's argument that **Evans v. State**, 797 So. 2d 811, 815-18 (Miss. 2000), warrants relying on the word "justified" in one jury instruction to cover the absence of "not in necessary self defense" in another.  There is no equivalent instruction using the word "justified" among those given by the trial court in the instant case save the **Robinson** instruction which is insufficient for reasons already discussed.

submitted as a factual issue for determination by the jury under proper instruction of the court. Where a defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error. *Hester v. State*, 602 So. 2d 869, 872 (Miss. 1992) (citations omitted)."). *See also Montana*, 822 So. 2d at 962. From the testimony adduced at trial, questions requiring jury resolution include: how of the fight actually occurred, who started the fight, the type of participation of each defendant, who was shooting at whom, how many people were involved for either side, and what amount of force–if any–was reasonable for the defendants to use to repel attack. It is more likely that error would have resulted had the trial court chosen not to instruct on self-defense.

¶70. The facts of this case require reversal. The defendants were convicted of depraved heart murder. The depraved heart murder instructions do not contain the language "not in necessary self defense" nor do they inform the jury of its duty to acquit the defendants should it conclude the defendants were acting in self-defense. No other instruction adequately informed the jury of that duty. The plain result is reversible error under *Reddix*. There is no saving grace to be found in the manslaughter instructions 12, 13, 13A, and 13B. The jury is presumed to have followed the court's instructions and considered depraved heart murder first and manslaughter separately. The jury noted the distinct differences between the two groups of instructions and asked for clarification on those differences. The most glaring difference between these sets of instructions is the lack of the self-defense language in the depraved heart murder instructions. Based on the jury instructions, the jury here would have concluded that all the separate instructions relating to self-defense applied only to the consideration of manslaughter.

¶71. By affirming these verdicts, the majority holds that a jury may find guilt without being adequately instructed on the elements of the crime. Because the majority's decision violates the defendants' right to

a fair trial, I dissent.

**McRAE, P.J., AND GRAVES, J., JOIN THIS OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶72.    This Court's holding in ***Reddix v. State***, 731 So. 2d 591 (Miss. 1999), controls the outcome of this case.  In ***Reddix***, this Court concluded it is reversible error to fail to instruct the jury on its duty to acquit should it determine the defendants were acting in self-defense.  The ***Robinson*** self-defense instruction discussed in ***Reddix*** was insufficient by itself to supplement the aggravated assault instruction given to the jury because it did not inform the jury of its duty to acquit.  Instructions 8, 9, and 10–the depraved heart murder instructions under which these defendants were convicted–did not do this either.  Since these instructions fail to adequately apprise the jury of its duty, and no other instruction adequately supplements them, I dissent.

¶73.    The trial court instructed the jury that it must first find the defendants not guilty of depraved heart murder before it could consider manslaughter.  The striking difference between the murder instructions and manslaughter instructions is the presence of the language "not in necessary self defense" in every one of the manslaughter instructions.  By merely reading the jury instructions alone, a juror can easily conclude that "necessary self defense" does not apply to depraved heart murder, and all of the given self defense instructions applied only towards the consideration of manslaughter.  Even though we regularly presume that a jury follows instruction from the trial court, the jury's note to the trial court gives us tangible evidence that it was paying close attention to the differences between the two sets of instructions.  The absence of the language "not in necessary self defense" or other language which would have informed the jury of its duty to find the defendants "not guilty" of depraved heart murder resulted in reversible error here.

¶74.    The majority contends at several points that other instructions informed the jury of its duty to acquit.

34

In each instance, the majority is referring to the manslaughter instructions or the *Robinson* instruction 16A. As discussed above, the jury was instructed that it could not consider manslaughter until after it had found these defendants not guilty of depraved heart murder. Therefore, those instructions restrict their application to themselves and do not supplement the depraved heart murder instructions 8, 9, and 10. The *Robinson* instruction 16A, as discussed in *Reddix*, is insufficient alone to apprise the jury of its duty to acquit. Instruction 6 does not inform the jury of its duty to acquit. Neither do all of the remaining instructions discussed in by the majority all of which bear uncanny resemblance to other instructions given in *Reddix* and proved insufficient to warrant affirmance in *Reddix*. Thus, I disagree with the majority's conclusion that other instructions adequately informed the jury of its duty with respect to the depraved heart murder instructions.

¶75.    The majority believes that *Reddix* can be distinguished from the instant case the same way *Montana v. State*, 822 So. 2d 954 (Miss. 2002), and *Williams v. State*, 803 So. 2d 1159 (Miss. 2001), were. This is incorrect because both murder instructions in *Montana* and *Williams* contained the self-defense language missing here. *Montana*, 822 So. 2d at 959; *Williams*, 803 So. 2d at 1162. The majority claims that the self-defense language was unnecessary because the depraved heart murder statute does not list it as an element of the offense. This is immaterial, as demonstrated in *Reddix*, because the aggravated assault statute under which Reddix was convicted did not list it as an element either. In *Reddix* this Court found the failure to include the self-defense language a reversible error anyway. Furthermore, I cannot join the majority's implication that some other word or phrase such as "unlawfully" or "without authority of law" is a sufficient synonym with "not in necessary self-defense" that an average juror would have been appraised of her duty to acquit here. Finally, the facts indicate a jury question was

created concerning who started the fight, how many people were involved, which of the defendants participated, and how much force–if any–was needed to act in self- defense. The majority's argument that the self-defense instructions were arguably erroneous is neither supported by the evidence nor the case law they cite which also discusses the granting of instruction on the defendants' theory of the crime. *See Montana*, 822 So. 2d at 962; *Williams*, 803 So. 2d at 1161.

¶76.    Because the jury convicted the defendants under a defective set of depraved heart murder instructions which did not inform it of its duty to acquit where appropriate, I cannot join the majority today in affirming this verdict.

¶77.    Because I would reverse and remand for a new trial before a properly instructed jury, I dissent.

**PITTMAN, C.J., JOINS THIS OPINION IN PART.**